UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

William Neuenswander,          :
        Plaintiff,             :
                               :
        v.                     :      File No. 2:05-CV-82
                               :
United States of America,      :
        Defendant.             :

## MAGISTRATE JUDGE'S REPORT & RECOMMENDATION
(Document 8)

Plaintiff William Neuenswander filed this medical malpractice action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 1346(b). Neuenswander alleges that the doctors at the White River Junction Veterans Administration Medical Center ("VAMC") committed medical malpractice when they failed to properly treat his skin disease.  The case is currently before this Court on the government's motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

For the following reasons, I recommend that the government's motion to dismiss (Doc. 8) be DENIED.

## BACKGROUND

Mr. Neuenswander suffers from Hidradenitis Suppurativa ("HS"), "a chronic, pus-producing..., scarring... disease process that occurs due to obstruction of hair follicles and

secondary infection and inflammation of certain sweat glands. . . .  The disease is characterized by the development of recurrent, boil-like nodular lesions and deep pus-containing pockets of infection... that may eventually rupture through the skin."  WebMD Health Guide A to Z available at http://www.webmd.com/hw/health_guide_atoz/nord 358.asp (last visited Dec. 8, 2005).

<u>1983 - September 1999</u>

Mr. Neuenswander first received treatment from the VAMC for HS in 1983.  (Doc. 1, ¶ 10).  At that time he had bilateral axillary[1] sinuses[2] excised.  (Doc. 8-2 at 5).  In 1992, he had a right groin sinus excised and a skin graft.  (<u>Id.</u>)  In 1996 he had "extensive perineal[3] resection[4] of abscesses with subsequent grafting."  (<u>Id.</u>)

On January 13, 1998, Neuenswander was admitted to the

---

[1]Axillary refers to the "fossa axillaris" which is "the small hollow, underneath the arm, where it joins the body at the shoulder . . ." Dorland's Illustrated Medical Dictionary 655 (28th ed. 1994).

[2]A sinus is "an abnormal channel or fistula permitting the escape of pus." <u>Id.</u> at 1530.

[3]The perineum is "the pelvic floor and the associated structures occupying the pelvic outlet."  <u>Id.</u> at 1261.

[4]Resection is the "excision of a portion or all of an organ or other structure." <u>Id.</u> at 1446.

VAMC for treatment of his HS.  (Id. at 4).  At that time he was diagnosed with "recurrent [HS] of the perineal area." (Id.)  Generally, his treatment consisted of debridement[5], dressing changes and skin grafts.  (Id. at 4-7).  However, his treatment was complicated by infection and slow healing. (Id. at 5-7).

More specifically, Neuenswander's wounds were debrided four times during his first month at the VAMC.  (Id. at 4). Because his wounds were not healing well, he was given a diverting colostomy in February 1998.  (Id. at 5-6).  His condition improved after the colostomy.  Accordingly, in March 1998 his wounds were debrided again and he received a skin graft.  (Id. at 6).  The skin graft became infected. (Id.)  After more debridement, his wounds showed signs of healing, so he underwent another skin graft on April 17, 1998.  (Id.)  This graft also failed to heal.  (Id.)  A series of tests did not reveal any abnormalities to explain his repeated failure to heal.  (Id.)  His wounds were debrided again on August 12 and 13.  (Id. at 4, 6).  On

---

[5]Debridement is the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed. Id. at 430.

August 14, he was diagnosed with a subcutaneous abscess at the site of his colostomy.  (Id. at 6).  This abscess was incised and drained.  (Id. at 7).  This wound also failed to heal and he "developed a chronic infected fistula[6] . . . located medially[7] to the colostomy with a minimal amount of purulent discharge."  (Id.)  His wounds were irrigated eight times during September 1998.  (Id. at 4).

On January 25, 1999, after more than a year of inpatient treatment, Neuenswander was discharged from the VAMC.  (Id.)  According to the discharge report, he was in stable condition, his dependence on pain killers had subsided because of his improved condition, but he had a chronic non-healing wound in the perineal area.  (Id. at 7).  He was transferred to Brookside Health and Rehabilitation Center ("Brookside") with recommendations "to continue daily dressing changes of his wounds in the perineal and colostomy areas."  (Id.)

Neuenswander was scheduled to follow-up with general and plastic surgery at the VAMC on February 18, 1999.  (Doc.

---

[6]A fistula is "an abnormal passage . . . leading from an internal organ to the surface of the body."  Id. at 635.

[7]Medially "pertain[s] to the middle; closer to the . . . midline of the body."  Id. at 998.

8-2 at 12).  However, he cancelled these appointments because he thought they were too soon.  (Id. at 12-13). He also cancelled his next follow-up appointment with the plastic surgery department that was scheduled for March 11, 1999.  (Id. at 12).  On March 16, 1999, he went to his first follow-up appointment at the VAMC.  (Id.)  In May 1999, a Brookside nurse reported that Neuenswander's groin wound showed "little to no improving."  (Doc. 8-2 at 16).  The nurse also reported that Neuenswander "refuses to be an experiment any more - Adamant about never going back to VA - 'would rather die here.'"  (Id.)

On June 17, 1999, Neuenswander had another follow-up appointment at the VAMC. (Doc. 8-3 at 13).  At this appointment, he told the doctor that he was concerned that his condition was getting worse.  (Id.)  The doctor reported that the groin wounds were much improved with no signs of infection, and that there was a wound between the glans and the shaft of the penis with purulent drainage but no cellulitis.  (Id.)  The doctor noted that Neuenswander was "overall probably improved."  (Id.)  After this visit, Neuenswander did not receive any further treatment at the VA.

On July 19, 1999, Dr. Holub, the physician at
Brookside, noted that Neuenswander had reported adequate
pain control and increased ability to get up and irrigate
his groin and perianal wounds.  (Doc. 8-3 at 2).  Dr. Holub
also reported that Neuenswander, since taking anti-
depressant medication, "general[ly] feels quite satisfied
but typically and appropriately concerned about the
chronicity of illness."  (Id.)

On August 8, 1999, a Brookside nurse reported an
increase in the discharge and odor of Neuenswander's wounds,
little to no improvement of his penis and copious yellow
discharge.  (Doc. 8-3 at 15).  Dr. Holub saw Neuenswander on
August 11 and reported that although the nurses thought the
wounds were getting worse, Neuenswander thought his
condition was the same.  (Doc. 8-2 at 18).  Neuenswander
also reported that he was encouraged by his last visit to
the VAMC because Dr. Brown noted improvements.  (Id.)
Neuenswander agreed to more testing to discover the cause
for his delayed healing.  (Id.)  Dr. Holub concluded that he
was "not sure that given extreme nature of [Neuenswander's]
case that the VA hospital are the only specialists we should
be using and I will likely be contacting another plastic

6

surgeon for a second opinion." (Id.)

Neuenswander reported to a nurse at Brookside on September 14, 1999 that he did not want to return to the VAMC for his three-month appointment scheduled for September 16. (Doc. 8-2 at 20). He also expressed "concern that penis has increase discharge from around shaft." (Id.) The nurse also noted that the "pocket under glans" has "dark thick discharge." (Id.) Neuenswander asserted that he did not want to return to the VAMC because "the trip ... was extremely painful ... and at every appointment all the doctors would do is to take the dressings off, look at the wound, write notes and tell me they were satisfied with the progress." (Doc. 11-2, ¶ 10). On September 16, 1999, he told Dr. Holub that he didn't want to go to the VA because "they never have anything new to offer." (Doc. 8-3 at 2). Dr. Holub noted that he was "forced to agree with [Neuenswander's] assessment at this point. I have previously felt his wounds were not healing adequately and have expected a more aggressive approach, but Dr. Brown is satisfied with his progress, expecting a relatively slow recovery." (Id.) Dr. Holub also reported a general improvement in Neuenswander's condition since coming to

7

Brookside, but noted the extensive wounds on the sacrum, perineum, penile shaft and bilateral inguinal folds.  (Id.)

    November 1999 - June 2000

    During November 1999, Brookside nurses reported increased pain, increased mucus discharge from penile wound, and bleeding from the rectal area.  (Doc. 8-3 at 17-19). The nurse also noted that Neuenswander's "skin integrity is impaired."  (Id. at 19).

    In January 2000, Dr. Holub noted an increase in the size of the wounds of penile shaft, perineum and sacrum. (Doc. 8-3 at 23).  He also noted that he was attempting to get a consultation in Boston.  (Id.)  In February 2000, a nurse reported to Dr. Holub that Neuenswander was in extreme pain, had urinary incontinence, and a decrease in the amount of skin keeping his glans attached.  (Doc. 8-3 at 25).

    Dr. Holub referred Neuenswander to the plastic surgery clinic at Fletcher Allen Health Care in June 2000.  (Doc. 8-3 at 4).  "Dr. Holub noted in his referral letter this wound situation [failed graft and treatment by dressing changes] has been relatively static with not much improvement or worsening since that time."  (Id.)  Neuenswander was seen by Dr. Laub who reported that Neuenswander had "open

8

granulating[8] wounds" with no signs of cellulitis[9] or infection, a large surgical wound that did not show signs of contracting, a groin wound that was contracting and healing, and no change in the perineal/perianal area (according to the photographs).  (Id.)  Dr. Laub also suggested that bacterial colonization was the cause of Neuenswander's delayed healing.  (Id.)  Dr. Laub concluded that Neuenswander was not a good candidate for surgery because of his psychological and pharmacological problems.  (Id.)

July 2000 - March 2001

In July 2000, a Brookside nurse reported that the social worker had had many conversations with Neuenswander about getting additional consultations and seeking out more aggressive treatment but that Neuenswander did not want to seek alternative treatment.  (Doc. 8-3 at 7).  He said that he believed that Brookside was "doing what they can for him."  (Id.)  He acknowledged that there might be another facility that could help him but was reluctant to go

---

[8]Granulating means "forming small beadlike masses of tissue that form on the surface of wounds."  Id. at 715.

[9]Cellulitis is "acute, diffuse, spreading, [pus-producing] inflammation of the deep subcutaneous tissues and sometimes muscle, which may be associated with abscess formation."  Id. at 295.

anywhere.  (Id.)  He also said that the skin grafts had not worked and the VAMC said that they can't do more.  (Id.)  In August 2000, a nurse reported that Neuenswander "refuses to go to any appointments or leave [Brookside]."  (Id.)

In October 2000, Dr. Sarkis, who replaced Dr. Holub at Brookside, reported that Neuenswander's condition had improved with antibiotics: he had less pain, less discharge, less smell, and was able to walk more.  (Doc. 11-9 at 1). Dr. Sarkis indicated that the current wound "appears to be stable" by comparison to the photographs.  (Id.)  However, Dr. Sarkis also reported that Neuenswander had a "difficult to heal perineal wound compromising the penile shaft...deep, extensive peroneal [sic] wound extending from inguinal[10] area down to the sacrum peroneum [sic] involving the scrotum and penile shaft."  (Id.)  Dr. Sarkis noted that she had repeatedly discussed with Neuenswander "the need to get another surgeon involved in his chronic care."  (Id.)

In November 2000, a Social Services Progress Report indicated that Neuenswander had a positive outlook.  (Doc. 11-10).  Neuenswander also reported that he was healing slowly but anticipated leaving the facility.  (Id.)

---

[10]Inguinal "pertains to the groin."  Id. at 841.

On March 29, 2001, Dr. Breuing at Brigham and Women's Hospital in Boston saw Neuenswander by referral from Dr. Sarkis.  (Doc. 8-3 at 27).  Dr. Breuing reported that Neuenswander's "entire groin region and perineum, scrotum, and gluteal folds are deeply ulcerated and covered with purulent exudate.[11]"  (Id. at 28).  Dr. Breuing discussed treatment options with Neuenswander and recommended transferring him to Brigham and Women's Hospital where he would have more wound debridement followed by "vacuum assisted closed device sponge" to repair the bacterial balance.  (Id. at 28-29).  Dr. Breuing also suggested additional skin grafting.  (Id. at 29).

November 2001 - July 2002

Neuenswander's treatment with Dr. Breuing was delayed pending approval by Medicaid.  (Doc. 8-3 at 31-32, 34-35, Doc. 8-4 at 2).  In the interim, Neuenswander was seen at Cottage Hospital in New Hampshire on November 3, 2001 where doctors excised the necrotic glans of his penis.  (Doc. 8-3 at 34).

---

[11]Exudate is "material, such as fluid, cells, or cellular debris, which has escaped from blood vessels and has been deposited in tissues or on tissue surfaces, usually as a result of inflammation."  Id. at 597.

On November 11, 2001, Neuenswander was admitted to Brigham and Women's Hospital. (Doc. 8-4 at 2). He underwent repeated wound debridement which was treated with vacuum sponges. (Id. at 3). On November 23, 2001, Neuenswander had a skin graft, also treated with vacuum sponges. (Id.) This graft was ultimately unsuccessful. (Id.) Neuenswander received extended wound care at the hospital and was finally discharged to a rehabilitation center in February 2002. (Id.) After a follow-up visit in July 2002, Dr. Breuing reported that Neuenswander "has made remarkable progress." (Doc. 8-4 at 19). He walked into Dr. Breuing's office, had no discomfort and was no longer taking any pain medications. (Id.)

> His wounds have significantly decreased in size and the skin grafted regions have continued to grow in ... The groin regions are almost entirely healed on the right side and closed up on the left. The peripenile shaft ulcers have healed and redundant excess skin might be suitable for a limited reconstruction of the penile shaft at some point. The ulcerations around the sigmoid colostomy are healed but more importantly the perineal and perianal tissues have started to reepithelialize so that Bill actually has a reasonable chance of a successful colostomy takedown ... It will still take several more weeks, until all of the wounds are healed; however, I see that this goal will be reached in the very near future.

(Id.)

Neuenswander filed an administrative claim with the Veterans Administration ("VA") on September 3, 2002 alleging medical malpractice.  The claim remained unresolved for over two years.  In December 2004, Neuenswander contacted the VA and submitted a copy of the complaint he intended to file in Federal court.  The VA responded that the file was ready for review and requested an additional 60 days to make a decision, to which Neuenswander agreed.  Neuenswander filed this action in April 2005.  The VA denied his claim on May 4, 2005.  This Court held a hearing on the government's motion to dismiss on January 17, 2006.

DISCUSSION

The government raises two issues in its motion to dismiss.  First, it asserts that Neuenswander's claim is barred by the statute of limitations because it accrued more than two years before he filed his administrative claim.  Second, the government argues that even if the entire claim is not barred, Neuenswander's claims of malpractice prior to 1998 are barred because they were not included in his administrative claim.

I. Standard of Review

A Rule 12(b)(1) motion can challenge the subject matter jurisdiction of the court either by (1) contesting the sufficiency of the complaint on its face, or (2) disputing the factual allegations. Hayden v. New York Stock Exch., Inc., 4 F. Supp. 2d 335, 337 (S.D.N.Y. 1998). Generally, on a Rule 12(b)(1) motion the Court reads the plaintiff's complaint with generosity and accepts the allegations as true. Hinesburg Sand & Gravel Co., Inc. v. Chittenden Solid Waste Dist., 959 F. Supp. 652, 656 (D. Vt. 1997)(citing Atl. Mut. Ins. Co. v. Balfour Maclaine Intern., 968 F.2d 196, 198 (2d Cir. 1992)). However, when the jurisdictional facts are disputed, the court "may engage in fact-finding," Fisher v. F.B.I., 94 F. Supp. 2d 213, 216 (D. Conn. 2000), and look to evidence outside the pleadings. Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998). The burden of proof is on the party asserting jurisdiction. Linardos v. Fortuna, 157 F.3d 945, 947 (2d Cir. 1998).

Generally, only a Rule 12(b)(6) motion that relies on evidence outside the pleadings is converted into a motion for summary judgment. Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1010-11 (2d Cir. 1986). However, "where jurisdiction is so intertwined with the merits that its

14

resolution depends on the resolution on the merits, the trial court should employ the standard applicable to a motion for summary judgment." <u>London v. Polishook</u>, 189 F.3d 196, 198 (2d Cir. 1999).  In this case, the question of when Neuenswander's claim accrued depends on when he knew or should have known that he was injured and the cause. Neither of these jurisdictional facts resolves the underlying issue of this medical malpractice case, namely whether the VA breached the applicable standard of care when they treated him.  Therefore, it would not be appropriate for this Court to apply a summary judgment standard of review to the government's motion to dismiss for lack of subject matter jurisdiction.

II. <u>Accrual</u>

The FTCA is a limited waiver of sovereign immunity by the United States whereby one can sue for the "negligent or wrongful act or omission" of a government employee.  28 U.S.C. § 1346(b)(1).  However, "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b). Neuenswander filed his administrative claim with the VA on

15

September 3, 2002.  Therefore, if his claim accrued before
September 3, 2000, this action is barred.

    A. Legal Test

    Although liability under the FTCA is predicated on
state law, federal law governs when a claim accrues for
purposes of the two-year limitations period.  Rispoli v.
United States, 576 F. Supp. 1398, 1401 (E.D.N.Y. 1983),
aff'd mem., 779 F.2d 35 (2d Cir. 1985).  The seminal case on
the accrual of a medical malpractice claim under the FTCA is
United States v. Kubrick, 444 U.S. 111 (1979).  In that case
the Supreme Court decided that a claim accrues when the
party has knowledge of both the injury and its cause.  Id.
at 122.  Accrual need not be delayed until the claimant has
knowledge of his legal rights.  Id.  However, "accrual may
be postponed until the plaintiff has or with reasonable
diligence should have discovered the critical facts of both
his injury and its cause."  Barrett v. United States, 689
F.2d 324, 327 (2d Cir. 1982) (citing Kubrick).  Generally,

> [d]iscovery of the 'critical facts' of injury
> and causation is not an exacting requirement,
> but requires only knowledge of, or knowledge
> that could lead to, the basic facts of the
> injury, i.e., knowledge of the injury's
> existence and knowledge of its cause or of the
> person or entity that inflicted it...[A]
> plaintiff need not know each and every

16

> relevant fact of his injury or even that the
> injury implicates a cognizable legal claim.

Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998)
(citation omitted).  A claim will not accrue when the
claimant simply has a suspicion, "but such suspicions do
give rise to a duty to inquire into the possible existence
of a claim in the exercise of due diligence."  Id.
(citations omitted).  However, "[w]here a patient has been
told that complications will arise and, when they do arise,
is told further that they can be treated, he cannot be
deemed to have knowledge of an injury.  In such
circumstances, he can only be deemed to have knowledge after
a sufficient period of time has passed so as to alert him
that the treatment is unsuccessful."  Rispoli, 576 F. Supp.
at 1403.

Neuenswander argues that the Kubrick standard is
inapplicable because his claim is based on a pre-existing
condition.  Therefore he contends that his claim should be
evaluated by the standard applied in Augustine v. United
States, 704 F.2d 1074, 1078 (9th Cir. 1983).  In that case,
the court decided that Kubrick "cannot be applied
mechanically to cases involving the failure to diagnose,
treat or warn."  Id.  The court reasoned that

17

> [w]hen a physician's failure to diagnose,
> treat or warn a patient results in the
> development of a more serious medical problem
> than that which previously existed,
> identification of both the injury and its
> cause may be more difficult for a patient than
> if affirmative conduct by a doctor inflicts a
> new injury. Where a claim of medical
> malpractice is based on the failure to
> diagnose or treat a pre-existing condition,
> the injury is ... the development of the
> problem into a more serious condition which
> poses greater danger to the patient or which
> requires more extensive treatment. In this
> type of case, it is only when the patient
> becomes aware or through the exercise of
> reasonable diligence should have become aware
> of the development of a pre-existing problem
> into a more serious condition that his cause
> of action can be said to have accrued for
> purposes of section 2401(b).

Id.

The government has cited "failure to treat" cases resolved under the Kubrick standard and argues that these cases establish the rule that a claim accrues "when a plaintiff is aware that his condition is worsening and has reason to suspect that treatment provided by government doctors may have been a cause of that condition." (Doc. 8 at 10). The Court is not persuaded that this is the rule created by this line of cases. Moreover, it is not clear that the Augustine standard is inconsistent with Kubrick. Certainly, some courts have relied on Augustine to evaluate

"failure to treat" cases.  See Hughes v. United States, 263
F.3d 272, 278 (3rd Cir. 2001); Nicolazzo v. United States,
786 F.2d 454, 456 (1st Cir. 1986);  Green v. United States,
765 F.2d 105, 109 (7th Cir. 1985).  See also Raddatz v.
United States, 750 F.2d 791 (9th Cir. 1984); Young v. United
States, 698 F. Supp. 393 (D. Mass. 1988).  However, other
courts have evaluated "failure to treat" cases under
Kubrick, without relying on Augustine.  See Sexton v. United
States, 832 F.2d 629, 633 (D.C. Cir. 1987); Drazan v. United
States, 762 F.2d 56, 58 (7th Cir. 1985); Arvayo v. United
States, 766 F.2d 1416, 1420 (10th Cir. 1985).  See also
Mortensen v. United States, 509 F. Supp. 23 (S.D.N.Y. 1980).
Nevertheless, under either standard, Neuenswander has a duty
to inquire into both the existence and the cause of his
injury.  The parties agree that Neuenswander's injury is the
deterioration of his medical condition.  Therefore, under
either standard the question is whether Neuenswander knew or
should have known prior to September 3, 2000 that (1) his
condition was deteriorating and, (2) that the worsening was
caused by the medical treatment he received at the VAMC, not
by the natural progression of his disease.  This is an
objective test based on the standard of a reasonable person

19

under the circumstances.  See Rispoli, 576 F. Supp. at 1402;

Barren v. United States, 839 F.2d 987, 991 (3rd Cir. 1988);

Arvayo, 766 F.2d at 1422.

B. Application

The government argues that Neuenswander's claim

accrued in September 1999 when he abandoned further

treatment by VAMC.  Alternatively, the government argues

that his claim accrued by June 2000 at the latest when he

saw Dr. Laub at Fletcher Allen Health Care.  Neueunswander

contends that his claim accrued on November 3, 2001 when his

penis sloughed off, or at the earliest in March 2001 when he

saw Dr. Breuing at Brigham and Women's Hospital.

1. Condition

Based on the foregoing, the first step in this inquiry

is to determine whether Neuenswander knew or should have

known that his condition was deteriorating.  The government

argues that Neuenswander knew his condition was

deteriorating as early as September 1999, when he and Dr.

Holub voiced dissatisfaction with the VA and abandoned any

further treatment.

Based on the medical records before the Court,

Neuenswander's claim did not accrue in September 1999.  In

June 1999 the VAMC reported improvements despite Neuenswander's concerns that his condition was getting worse.  The doctor noted that the groin wounds were much improved, and that Neuenswander had a wound between the glans and shaft of his penis, but concluded that Neuenswander's condition was "overall probably improved."

In July 1999 Dr. Holub reported that Neuenswander was concerned about the "chronicity of his illness."  However, this is noted among a series of apparent improvements such as adequate pain control, increased ability to get up in the morning and irrigate wounds, improved mood, and generally feeling "quite satisfied now."

In August 1999, Dr. Holub reported that the Brookside nurses thought that Neuenswander's condition was deteriorating.  However, he also reported that Neuenswander "feels that his wounds are about the same and was encouraged by his last visit to plastic surgery at the VA Hospital where Dr. Brown said that his wounds were improving."  Although Dr. Holub also noted that "I am not sure that given the extreme nature of his case that the VA Hospital are the only specialists we should be using and I will likely be contacting another plastic surgeon for a second opinion," it

21

is not clear whether Dr. Holub discussed this plan with
Neuenswander.

On September 14, 1999, a Brookside nurse reported that
Neuenswander did not want to go his VA appointment but was
concerned "that penis has increase discharge from around
shaft."  On September 15, 1999, a Brookside nurse reported
that Dr. Holub saw Neuenswander and they decided to cancel
the appointment at the VAMC scheduled for the next day.  The
nurse also noted that "MD will contact us [with] rescheduled
VA appt. and appt. [with] a specialist he is trying to
arrange."  Dr. Holub's notes from that visit indicate that
"Bill resists going to see plastic surgeons at the VA
hospital, stating that they never have anything new to
offer.  I am forced to agree with his assessment at this
point.  I have previously felt his wounds were not healing
adequately and have expected a more aggressive approach, <u>but
Dr. Brown is satisfied with his progress, expecting a
relatively slow recovery</u>."  Nonetheless, Dr. Holub concluded
that despite "[e]xtensive wounds on sacrum, perineum, penile
shaft, and bilateral inguinal folds with red and friable-
appearing tissue and moderate whitish discharge,"
Neuenswander's shows "[g]eneral improvement over admission,

22

though not much."

Based on these records, by September 1999 it was reasonable for Neuenswander to rely on the reports from his doctors that the treatment of his wounds was producing positive, albeit slow, results and that his condition was not getting worse.  See Rispoli, 576 F. Supp. at 1403 (finding that patient who was assured by his doctor that condition would be treated and would heal did not know of his injury until after treatment was unsuccessful).  Hence, Neuenswander's claim did not accrue in September 1999 as the government contends.

In November 1999, the Brookside nurses reported that there was an increase in yellow mucus discharge from Neuenswander's penile shaft, that the healing process was slow, he had "open areas perineum, penis, groin," and that his skin integrity was impaired.  By January and February of 2000, the Brookside nurses reported that the glans of his penis was detaching, he was losing control of urination and was experiencing extreme pain.  However, in June 2000, when Neuenswander saw Dr. Laub at FAHC, Dr. Holub reported that Neuenswander's "wound situation has been relatively static with not much improvement or worsening since that time."  In

October 2000, Dr. Sarkis reported that antibiotics have improved Neuenswander's condition, and it was not until November 2001 that Neuenswander's glans was removed at the emergency room.

Although in retrospect Neuenswander's condition might appear to have been worsening during this period, the question is whether Neuenswander knew or should have known that his condition was deteriorating.  Based on Dr. Holub's reports, Neuenswander's condition was static.  Dr. Laub concluded that Neuenswander's "surgical wound showed no signs of contraction although the inguinal area indeed are contracting and show signs of healing.  The perineal and perianal area however do not show any change over the photographed period."  Moreover, although Dr. Laub did not recommend further surgery, he did not recommend any alternative treatments.  By June 2000, therefore, it was still reasonable for Neuenswander to rely on the evaluations of his condition and treatment by his doctors.  Similarly, in Mortensen v. United States, 509 F. Supp. 23 (S.D.N.Y. 1980) the plaintiff suffered injuries to his back and arms from a fall.  He sought treatment from the Public Health Service ("PHS"), who diagnosed ulnar nerve neuropathy that

24

would improve with time.  Id. at 25.  Approximately six months after his discharge from PHS and after another accident, the plaintiff was told by a non-PHS doctor that surgery was recommended for his ulnar nerve symptoms.  Id. at 25-26.  The court decided that the plaintiff's claim had not accrued at the time of his discharge from PHS.  Id. at 28.  Rather, the court reasoned that "[w]hen plaintiff was told by [the PHS doctor] that his condition would improve with time, and that nerve injuries sometimes take a long time to heal, he was entitled to accept and rely upon the diagnosis of his doctor, although, at the time, he felt his condition was deteriorating."  Id.  The court determined that the claim accrued when, with the knowledge that his condition had not improved, the plaintiff saw the non-PHS doctor who recommended an alternative treatment option, namely surgery.  Id. at 28-29.  At that time he had the "critical facts of injury and causation" such that he could discover whether the PHS was negligent "in failing to properly diagnose his condition, to properly follow up its treatment of that condition, and to recommend surgery."  Id. at 29.

Accordingly, by June 2000, even though Neuenswander

might have thought that his condition was deteriorating, Dr. Holub and Dr. Laub reported that his condition had been static. Additionally, given his treatment history and the nature of this chronic disease that manifests itself with periodic outbreaks, it is reasonable that Neuenswander did not consider the developing wound on his penis as an indication that his overall condition was getting worse. Rather, under the circumstances it was reasonable for Neuenswander to believe that he was simply enduring his recurring disease. Therefore, his claim could not have accrued at this time.

    2.  Cause

    Notwithstanding the foregoing, even if Neuenswander knew that his condition was deteriorating by June 2000, he must also know the cause in order for his claim to accrue. The government suggests that the duration of Neuenswander's in-patient treatment at the VA should have made him aware that the VA treatment (or lack thereof) was the cause of his condition. However, Neuenswander suffers from a chronic skin disease. The fact that he received treatment from the VA does not necessarily translate into knowledge that this treatment has any causative relationship with his condition.

In <u>Drazan</u>, for example, the patient received annual chest x-rays from the VA for many years.  762 F.2d at 59.  His last x-ray revealed a large cancerous tumor in his lung, which caused his death the following month.  The court found that the statute of limitations did not start to run until his wife learned "the cause that [was] in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury."  <u>Id.</u>  Hence, although she knew that her husband died from lung cancer treated only by the VA, the cause of action did not accrue until she learned that the government had failed to follow up on the results of an earlier x-ray that indicated a small tumor. Similarly, it is not enough to say that because Neuenswander had extensive treatment from the VA that he necessarily knew or should have known that this treatment, or failure to treat, caused his condition to worsen.

The government relies on <u>Sexton</u> to argue that knowledge of "the basic nature of treatment" is sufficient.  832 F.2d 629.  However, the <u>Sexton</u> court's reasoning was as follows: "[A] man is admitted to a hospital with heart problems, and the doctors administer remedies A, B and C.  They do not use

alternative remedies D, E and F.  The man knows nothing of these; he is not a doctor.  But, if he dies, his survivors are armed with the knowledge that A, B and C were the only remedies employed. . . . [T]he survivors can properly be said to know the cause of the injury: they know that death resulted from (1) a natural cause (2) treated only by remedies A, B and C." Id. at 633-634.  The patient himself was not charged with this knowledge and the claim didn't accrue until his death.  Id. at 637.  Green is also distinguishable on its facts.  765 F.2d 105.  In that case, the court found that the patient knew, or should have known, of his injury and its cause when he received diagnosis and treatment by a non-VA hospital that explained that the cause of his condition was the radiation treatments he received from the VA.  In Neuenswander's case, the comparable scenario did not occur until he saw Dr. Breuing in March 2001.  In fact, even after seeing Dr. Laub in June 2000, Neuenswander still had no reason to believe that his condition was caused by anything other than the natural progression of his disease.

Accordingly, Neuenswander's claim did not accrue by June 2000, even if he knew at that time that his condition

had deteriorated.  Rather, it was not until March 2001 when Neuenswander saw Dr. Breuing that he reasonably could have known that the progression of his condition was exacerbated by the VAMC's failure to properly treat him.  Therefore, Neuenswander's claim necessarily accrued after September 3, 2000 and his action is timely.  I recommend that the government's motion to dismiss based on the statute of limitations be denied.

III. <u>Administrative Review</u>

On September 3, 2002, Neuenswander presented an administrative claim to the VA alleging "negligent, reckless wanton failure to properly treat claimant's disease, hydradenitis."  (Doc. 1-2, Page 1).  Neuenswander reported the "Date and Day of the Accident" as "Not a single trauma, 1998-2001."  (<u>Id.</u>)  Two years later, but four months before the final administrative decision, Neuenswander submitted to the VA a draft of his civil complaint and an expert's report alleging that the VA had failed to properly treat his condition beginning in 1983.

The government argues that this Court lacks subject matter jurisdiction over all claims prior to 1998 because they were not properly presented to the agency.

Neuenswander responds that the VA had sufficient information to conduct an investigation and evaluate his claim and therefore all the claims in the complaint were properly raised with the agency.

Under the FTCA, "an action shall not be instituted upon a claim against the United States ... unless the claimant shall have first presented the claim to the appropriate Federal agency . . . ."  28 U.S.C. § 2675(a).  This presentment requirement is jurisdictional and cannot be waived.  Keene Corp. v. United States, 700 F.2d 836, 841 (2d Cir. 1983).  Additionally, because the FTCA is a waiver of sovereign immunity, its procedures are applied strictly. Id.

The purpose of the presentment requirement is to "expedite the fair settlement of tort claims" and "ease court congestion and avoid unnecessary litigation."  Johnson v. United States, 788 F.2d 845, 848 (2d Cir. 1986)(citation omitted), overruled on other grounds by Sheridan v. United States, 487 U.S. 392 (1988).  Accordingly, to satisfy the presentment requirement, a claimant need only "provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth."  Romulus

30

v. United States, 160 F.3d 131, 132 (2d Cir. 1998).  "[A]n
administrative claim need not meet formal pleading
requirements."  Johnson, 788 F.2d at 848.  "[It] need do no
more than provide sufficient information as to allow the
agency to process a claim administratively."  Dundon v.
United States, 559 F. Supp. 469, 477 (E.D.N.Y. 1983).

For example, in Johnson, the plaintiffs presented an
administrative claim based on an alleged sexual assault by a
postal employee.  788 F.2d at 847-848.  The subsequent
complaint alleged negligent supervision by the Postal
Service.  The court reasoned that, "Although the
[administrative] claim supplied no facts evidencing
negligent supervision and did not allege all the factual
elements of such a theory of liability, a reasonably
thorough investigation of the incident should have uncovered
any pertinent information in the government's possession
relating to the agency's knowledge, or lack of knowledge, of
any prior sexual misconduct by its employee. . . ."  Id. at
849.

Unlike the plaintiff in Johnson, Neuenswander has not
alleged a different cause of action from the one presented
in his administrative claim.  He has alleged, and continues

31

to allege, medical malpractice based on the VA's failure to properly treat his chronic skin condition.  Certainly, a reasonable investigation of Neuenswander's claim for the failure to properly treat his medical condition, which had been treated exclusively by the VA for over twenty years, would include a review of his entire medical history with the VA and thereby "uncover any pertinent information."  <u>See Id.</u>  The VA was therefore reasonably on notice of the nature of Neuenswander's claim and had a reasonable opportunity to investigate his treatment history and other "closely related" matters.  <u>See generally</u> <u>Burchfield v. United States</u>, 168 F.3d 1252, 1256 ("Section 2675(a) does not require an agency to undertake an independent search for injuries or theories of liability that are not closely related to the matters described in the claim." (Citation omitted)); <u>Vega v. United States</u>, 68 F. Supp. 2d 113, 117 (D.P.R. 1999)("[T]he First Circuit has employed a lenient approach . . . keeping in mind that the law was not intended to put up a barrier of technicalities . . . Notwithstanding this leniency . . .the relevant agency [must] have enough information to reasonably begin an investigation of the claim and place value on the total claim.")

32

## CONCLUSION

For the foregoing reasons, I recommend that the government's motion to dismiss (Doc. 8) be DENIED.

Dated at Burlington, in the District of Vermont, this 3rd day of February, 2006.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify portions of the proposed findings, recommendations or report objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).